John A. Husmann
Gustavo A. Otalvora
BATESCAREY LLP
191 N. Wacker, Suite 2400
Chicago, IL   60606
Telephone: (312) 762-3100
Facsimile:  (312) 762-3200
Email: jhusmann@batescarey.com
Email: gotalvora@batescarey.com
       - and -
Jesse Beaudette
Ryan T. Heuwinkel
BOHYER, ERICKSON, BEAUDETTE & TRANEL, P.C.
283 West Front, Suite 201
Post Office Box 7729
Missoula, Montana  59807-7729
Telephone: (406) 532-7800
Facsimile: (406) 549-2253
Email:  mail@bebtlaw.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

GREAT FALLS DIVISION

| | |
|---|---|
| BITCO GENERAL INSURANCE CORPORATION, | Cause No. CV-18-00087-BMM-JTJ |
| Plaintiff, | THE HON. BRIAN MORRIS |
| -vs.- | **BITCO GENERAL INSURANCE CORPORATION'S BRIEF IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT** |
| J. BURNS BROWN OPERATING CO., | |
| Defendant. | |

Plaintiff BITCO General Insurance Corporation ("BITCO General"), pursuant to the Court's Order dated April 29, 2019 (Doc. 41), respectfully submits

this Brief in Support of BITCO's Cross-Motion for Summary Judgment against Defendant J. Burns Brown Operating Co. ("JBBOC").

## I. INTRODUCTION

The sole issue in this Declaratory Judgment Action is whether BITCO General has an obligation to indemnify its insured, JBBOC, in connection with the Montana Department of Environmental Quality's ("DEQ") demand that JBBOC cleanup and remediate an oil spill at the North Chinook Reservoir in Blaine County, Montana. BITCO General issued a primary policy and an umbrella policy to JBBOC. As BITCO General has already paid the applicable limit of insurance under the primary policy to JBBOC in connection with the DEQ's demand, the only remaining dispute is coverage under the umbrella policy.

The BITCO umbrella policy excludes coverage for the government-mandated clean-up and remediation of the oil spill pursuant to its pollution exclusion. JBBOC has conceded that the clean-up and remediation costs at issue fall within the scope of the umbrella policy's pollution exclusion. Consequently, there is no dispute that the clean-up and remediation costs at issue fall within the scope of the pollution exclusion.

Further, the sole exception to the pollution exclusion applies only if there is pollution coverage in the underlying primary policy up to the *full limit* of the primary policy (here, $1 million). That requirement is not met in this case because

the pollution coverage in the BITCO General primary policy was subject to a sublimit of $100,000 (which BITCO General has paid and JBBOC accepted). Consequently, JBBOC can never establish that the exception applies. Moreover and in the alternative, even if the pollution exclusion did not apply to bar coverage, BITCO General would have no obligation under the umbrella policy to JBBOC until JBBOC pays remediation costs above the $1 million attachment point of the umbrella policy. Therefore, BITCO General is entitled to a summary judgment ruling that it owes no coverage obligations to JBBOC under the umbrella policy.

## II. STIPULATED FACTS

### A. The Oil Spill and the DEQ's Subsequent Demand that JBBOC Clean-Up and Remediate All Resulting Pollution Contamination

In March of 2017, an oil-well production site operated by JBBOC released crude oil and production water into the North Chinook Reservoir in Blaine County, Montana. (Statement of Stipulated Facts, Doc. 38, at ¶1.) According to the Notice of Violation letter ("Notice of Violation") that the DEQ issued to JBBOC, an estimated 238 barrels of crude oil and 1,200 barrels of produced water were reported to have spilled. (*Id*. at ¶10.)

On or about March 30, 2017, JBBOC provided notice of the oil spill to the DEQ. (*Id*. at ¶3.) Thereafter, the DEQ determined that the oil spill resulted in contamination that exceeded limits in the Montana Water Quality Act, and it

demanded that JBBOC perform clean-up and remediation of the spill. (*See id* at ¶¶14-16.) Specifically, the June 23, 2017 Notice of Violation stated that the presence of crude oils in the waters of the North Chinook Reservoir is in violation of the Water Quality Act. (*Id*. at ¶¶4, 12.) The Notice of Violation further stated that "[b]ecause it is DEQ's determination that [JBBOC's] operations caused the crude oil contamination of surface waters at the site, the DEQ hereby issues to [JBBOC] this violation letter pursuant to § 75-5-617(1)(a), MCA." (*Id*. at ¶14.) In addition, the Notice of Violation set forth various comments and requirements regarding a "Remediation Plan" previously submitted by JBBOC, and it advised JBBOC that if it failed to comply with the requirements set forth in the Notice of Violation, the DEQ would issue an administrative order or commence a civil action requiring compliance. (*Id*. at ¶¶15-16.)

### B.  The BITCO General Insurance

BITCO General issued the primary and umbrella policies to JBBOC. As set forth below, the parties do not dispute coverage under the primary policy, and the only issue before the Court is whether the BITCO umbrella policy provides coverage for the subject clean-up and remediation costs.

#### 1.  The BITCO Primary Policy

BITCO General issued Commercial Lines Policy No. CLP 3 641 462 H to JBBOC, effective September 1, 2016 to September 1, 2017 ("BITCO Primary

Policy") with an "Each Occurrence" limit of $1 million. (*Id.* at ¶17.) The BITCO Primary Policy contains a "Total Pollution Exclusion," however the policy also contains an endorsement that provides "Contamination or Pollution Coverage," which expressly provides coverage for property damage arising out of the release or escape of oil, with an aggregate limit of insurance of up to $100,000. (*Id.* at ¶¶22-21.) It is undisputed that the Total Pollution Exclusion of the Primary Policy would otherwise bar coverage for the underlying claims against JBBOC, but that the Contamination or Pollution Coverage endorsement grants coverage for all the underlying claims against JBBOC up to a sublimit of $100,000. (*Id.* at ¶22.)

BITCO General indemnified JBBOC under the BITCO Primary Policy and paid the full $100,000 limits provided thereunder (*Id.* at ¶20), and it is undisputed that the applicable limit of the Primary Policy has been exhausted (*Id.* at ¶22). BITCO General now seeks a declaration that the BITCO *Umbrella* Policy does not provide coverage for any of the clean-up and remediation costs at issue.

2. **The BITCO Umbrella Policy**

BITCO General issued Commercial Umbrella Policy No. CUP 2 811 506 H to JBBOC, effective September 1, 2016 to September 1, 2017 ("BITCO Umbrella Policy"). (*Id.* at ¶18.) The BITCO Umbrella Policy contains its own insurance terms, conditions, and exclusions. (*See* Ex. 3 to Statement of Stipulated Facts, Doc. 38-3.) As is relevant to this matter, the Insuring Agreement states that the

Umbrella Policy provides coverage for the "'ultimate net loss' in excess of the 'retained limit' because of . . . 'property damage' caused by an 'occurrence' . . . ." (*Id.* at pg. 8.)

Unlike the Primary Policy, the BITCO Umbrella Policy excludes any coverage for the subject clean-up and remediation costs. (*See id.* at 40.) The Umbrella Policy does not contain a Contamination or Pollution Coverage endorsement, or any other provision granting coverage for oil spills or pollution liability. (*See generally id.*) Quite the opposite, the BITCO Umbrella Policy contains a pollution exclusion by way of endorsement captioned "Pollution Exclusion – Follow Form" ("Pollution Exclusion"), which squarely applies to bar coverage for the clean-up and remediation costs. (*Id.* at 40.) Specifically, the Pollution Exclusion states as follows:

It is agreed that this policy does not apply to:

(1) "Bodily injury," "property damage" or "personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time; or

(2) Any loss, cost, or expense arising out of any:

  (a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

> (b) "Claim" or "suit" on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants."

> \*\*\*

> This exclusion does not apply if insurance for such "bodily injury," "property damage" or "personal and advertising injury" is provided by "underlying insurance" at the limits shown in the schedule of "underlying insurance." Coverage for such "bodily injury," "property damage" or "personal and advertising injury" is subject to the same limitations as the "underlying insurance."

> \*\*\*

> "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

> \*\*\*

(*Id.*)

In addition, the Umbrella Policy contains the following definitions:

> 5. "Claim" means any demand upon the insured including the service of "suit" papers or arbitration proceedings against the insured for damages or services alleging liability of the insured as the result of an "occurrence" or "offense" which may or may not be covered by this policy. "Claim" does not include reports of accidents, or "occurrences," or any acts, errors, "offenses" or omissions which may give rise to a "claim."

> \*\*\*

> 19. "Retained limit" means the greater of:

a. That amount of "underlying insurance" applicable to any "claim" or "suit," whether such "underlying insurance" is collectable or not; or

b. The amount of "self-insured retention" as shown in the Declarations of this policy.

\*\*\*

24. "Underlying insurance" means the coverage(s) afforded under insurance policies designated in the schedule of "underlying insurance" on the Declarations Page of this policy….

\*\*\*

The coverage and limits stated in the Declarations for underlying insurance, and any renewals or replacements thereof, apply whether or not such is collectible.

\*\*\*

(*Id.* at 27, 30-31).

The Schedule of Underlying Insurance in the BITCO Umbrella Policy's Declarations Page lists the BITCO Primary Policy as the applicable general liability policy. (*Id.* at 6.) The relevant limit of the Primary Policy shown in the Schedule of Underlying Insurance is $1,000,000 for "Each Occurrence." (*Id.*)

C. **JBBOC's Tender of the DEQ's Notice of Violation**

JBBOC first notified BITCO General of the subject oil spill on or about March 30, 2017. (Statement of Stipulated Facts, Doc. 38, at ¶19.) BITCO General accepted coverage—under the BITCO *Primary* Policy—and indemnified JBBOC

with respect to the DEQ's Notice of Violation and the clean-up and remediation costs associated with the oil spill ("Clean-Up and Remediation Costs"). (*Id.* at ¶20.) Upon exhaustion of the applicable $100,000 limits of the Primary Policy's Contamination or Pollution Coverage, JBBOC demanded coverage for the subject pollution claim under the BITCO Umbrella Policy. (*Id.* at ¶23.) Upon receiving JBBOC's demand for coverage under the BITCO Umbrella Policy, BITCO General filed this Action seeking a declaration that the Pollution Exclusion of the BITCO Umbrella Policy applies to bar coverage for the Clean-Up and Remediation Costs. (*Id.* at ¶26.)

### III. STANDARDS ON MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party has met its burden of demonstrating to the Court that there is no genuine issue of material fact that should be decided at trial, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 584 (1986).

The interpretation of an insurance contract is a question of law for the Court to decide. *Newbury v. State Farm Fire & Cas. Ins. Co. of Bloomington, Ill.*, 184 P.3d 1021, 1025 (Mont. 2008). When interpreting an insurance policy, the policy

is to be read as a whole and, if possible, its various parts should be reconciled to give each one meaning and effect. *Id.* The terms and words used in an insurance policy are to be given their usual meaning and construed using common sense. *Id.* A court cannot create an ambiguity where none exists. *Id.* In addition, if an insurer establishes the applicability of a coverage exclusion, the insured then has the burden to prove that an exception to that exclusion applies. *Phoenix Ins. Co. v. Ed Boland Construction, Inc.*, 229 F. Supp. 3d 1183, 1188 (D. Mont. 2017); *see also Travelers Cas. & Sur. Co. v. Ribi Immunochem Research, Inc.*, 326 Mont. 174, 185, 186 (2005) (holding that the insured failed to meet its burden that the "sudden and accidental" exception to the pollution exclusion applied).

## IV. ARGUMENT[1]

### A. The Umbrella Policy's Pollution Exclusion Bars Coverage for the DEQ-Mandated Clean-Up and Remediation Costs.

#### 1. Paragraph (1) and Paragraph 2(a) of the Umbrella Policy's Pollution Exclusion Apply to Bar Coverage for the Clean-Up and Remediation Costs

Paragraph (1) of the Pollution Exclusion excludes coverage for "property damage" "arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." (*Id.* at ¶40.) As

---

[1] Under Montana's choice-of-law rule, Montana law governs the interpretation of the BITCO Umbrella Policy, because the named insured (JBBOC) has its principal place of business in Montana (*see* Doc. 7 at ¶ 3.), the underlying claimant is a Montana government agency, and the subject oil spill took place in Montana. *See Tidyman's Mgmt. Servs. Inc. v. Davis*, 376 Mont. 80, 330 P.3d 1139 (Mont. 2014).

set forth in the parties' Statement of Stipulated Facts, JBBOC expressly agrees that "[a]ny alleged ***property damage*** with respect to the North Chinook Reservoir or any other land or body of water at issue in the DEQ's Notice of Violation ***arises out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants.'***" (*Id.* at ¶24) (emphasis added). Indeed, the DEQ determined that crude oil and production water was ***released*** into the North Chinook Reservoir, resulting in the "***discharge*** of ***pollutants*** and various contaminations into the surrounding environment," including the hydrocarbon impact on 4.47 acres of upland and wetland nearby, the "crude oil ***contamination*** of surface waters," and contamination that exceeded limits set forth by the ***Water Quality Act***. (*Id.* at ¶¶1-3, 10-14) (emphasis added). Therefore, Paragraph (1) of the Pollution Exclusion applies to bar coverage for the Clean-Up and Remediation Costs. *See Montana Petroleum Tank Release Compensation Bd. v. Crumleys, Inc.*, 341 Mont. 33, 43-45 (2008) (stating that a clear majority of states have held that motor fuels are included in the definition of "pollutant" and thus finding that costs of cleanup and corrective action arising out a leak of diesel fuel was excluded under a pollution exclusion and covered under pollution coverage endorsement).

Similarly, Paragraph (2)(a) of the Pollution Exclusion also applies to bar coverage for the Clean-Up and Remediation Costs. As set forth above, Paragraph (2)(a) excludes coverage for any "loss, cost or expense arising out of any . . .

[r]equest demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of 'pollutants.'" (Ex. 3 to Statement of Stipulated Facts, Doc. 38-3 at 40.) Again, JBBOC also agrees that "any loss, cost, or expense sought from JBBOC or ordered to be paid by JBBOC ***arises out of a request, demand, or order by the DEQ that JBBOC test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to, or assess the effects of "pollutants."'"** (Statement of Stipulated Facts, Doc. 38 at ¶25) (emphasis added).[2] Indeed, it is undisputed that the DEQ *demanded* JBBOC to clean-up and remediate the oil spill and the resulting discharge of pollutants and various contaminations into the surrounding environment; and the DEQ advised JBBOC that if it failed to comply with the requirements set forth in the Notice of Violation, the DEQ would be statutorily required to issue an administrative order or commence a civil action requiring compliance, which could also include the assessment of penalties and costs. (*Id.* at ¶¶14-16.) Therefore, Paragraph (2)(a) also applies to the Clean-Up and Remediation Costs.

Therefore, the Pollution Exclusion applies to bar coverage for the Clean-Up and Remediation Costs arising out of the Notice of Violation, and BITCO General

---

[2] In addition, Paragraph (2)(b) of the Pollution Exclusion also applies because the DEQ's Notice of Violation constitutes a "claim" on behalf of a government authority. (*Id.* at 27.)

has no obligation to indemnify JBBOC for the Clean-Up and Remediation Costs under the BITCO Umbrella Policy.

### 2. The "Underlying Insurance" Exception of the Pollution Exclusion Does Not Apply to this Matter

The Pollution Exclusion in the BITCO Umbrella Policy contains an "underlying insurance" exception that provides, in relevant part, as follows:

> This exclusion does not apply if insurance for such "bodily injury," "property damage" or "personal and advertising injury" is provided by "underlying insurance" *at the limits shown in the schedule of "underlying insurance*." Coverage for such "bodily injury," "property damage" or "personal and advertising injury" is subject to the same limitations as the "underlying insurance."

***

(Ex. 3 to Statement of Stipulated Facts, Doc. 38-3 at 40) (emphasis added). Therefore, for the exception to the Pollution Exclusion to apply, the "property damage" at issue must be covered by "underlying insurance" and the applicable limit of insurance for the pollution coverage must be the *same as the limit of insurance shown in the Umbrella Policy's schedule of "underlying insurance*." (*Id.*) This requirement is simply not met, and thus JBBOC cannot meet its burden of demonstrating that the exception applies. *See Ed Boland Construction, Inc.*, 229 F. Supp. 3d at 1188 (stating that if an insurer establishes the applicability of a coverage exclusion, the insured then has the burden to prove that an exception to that exclusion applies).

Here, the BITCO Umbrella Policy lists the BITCO Primary Policy on its Schedule of Underlying Insurance, however the limit of the Primary Policy shown in the Umbrella Policy's Schedule of Underlying Insurance is $1 million for Each Occurrence. (Ex. 3 to Statement of Stipulated Facts, Doc. 38-3, at 6.) As noted above, the DEQ's claim against JBBOC was covered under the BITCO Primary Policy solely by operation of the Primary Policy's Contamination and Pollution Coverage Endorsement, which provides limits of up to ***$100,000***, and not $1 million. (Statement of Stipulated Facts, at ¶21.) Therefore, coverage for the alleged pollution at issue is not provided by the underlying insurance (the Primary Policy) "***at the limits shown in the schedule of 'underlying insurance*** [$1 million]'" as required in order for the exception to apply. (Ex. 3 to Statement of Stipulated Facts, Doc. 38-3 at 40.)

The BITCO Umbrella Policy would only provide pollution coverage by following the Primary Policy's "Contamination or Pollution Coverage" if the Primary Policy provided $1 million in pollution coverage, which is not the case.[3] Therefore, the BITCO Umbrella Policy does not provide any pollution coverage, and to hold otherwise would be inconsistent with the clear and unambiguous

---

[3] In addition, even if the exception to the Pollution Exclusion were to apply here, the Umbrella Policy would provide no more than $100,000 in coverage. As set forth above, the Pollution Exclusion states that if the "underlying insurance" exception applies, the coverage provided by the Umbrella Policy is subject to the same ***limitations*** of the "underlying insurance." (*Id*.) Here, the limit of insurance provided by the Primary Policy's Contamination or Pollution Coverage is $100,000. (Statement of Stipulated Facts, at ¶21.) Thus, if the exception applies here, then the Umbrella Policy's coverage is also limited to $100,000.

coverage limitations set forth in the BITCO Umbrella Policy. *See Montana Petroleum Tank Release Compen. Bd.*, 174 P.3d at 957 (if a policy term is clear and unambiguous, the court may not re-write the policy but must enforce it as written). Accordingly, the Pollution Exclusion bars coverage for the DEQ's claim under the Umbrella Policy.

**B.     In the Alternative, If the Pollution Exclusion Does Not Apply to this Matter, BITCO General Has No Obligation Under the BITCO Umbrella Policy Until the Clean-Up and Remediation Costs Exceed $1 Million**

Even if the "underlying insurance" exception applied and the Umbrella Policy was deemed to follow the Primary Policy's "Contamination or Pollution Coverage," coverage under the BITCO Umbrella Policy would attach excess of $1 million, and *not* excess of the $100,000 sublimit provided under the Primary Policy's Contamination or Pollution Coverage.

The BITCO Umbrella Policy provides coverage for the "'ultimate net loss' in excess of the 'retained limit'. . ." (Ex. 3 to Statement of Stipulated Facts, Doc. 38-3, at 8.) The BITCO Umbrella Policy defines "retained limit" in relevant part as the "amount of 'underlying insurance' applicable to any 'claim' or 'suit,' whether such 'underlying insurance' is collectable or not." (*Id.* at 30-31.) The Umbrella Policy defines "underlying insurance" to include any policy listed in its schedule of "underlying insurance" [the BITCO Primary Policy], and it further

states that the "*limits* stated in the Declarations for underlying insurance, and any renewals or replacements thereof, apply *whether or not such is collectible*." (*Id.* at 31.) (emphasis added). Therefore, the BITCO Umbrella Policy attaches excess of the BITCO Primary Policy at the limits stated in the Declarations for the Primary Policy, that is, $1 million. Accordingly, if the BITCO Umbrella Policy were deemed to provide coverage for the Clean-Up and Remediation Costs, such coverage would necessarily attach excess of $1 million.

Indeed, at least one court interpreting similar language and an analogous underlying sublimit reached this same conclusion. *See Union Insurance Co. v. Hull & Co., Inc.*, 985 F. Supp. 2d 951, 955-56 (S.D. Iowa 2012). In *Hull*, a primary policy contained a $1 million per-occurrence limit, but a sublimit of $500,000 for assault-and-battery coverage (by way of endorsement). *Id.* The umbrella policy in *Hull*—like the BITCO Umbrella Policy—provided coverage excess of the limits set forth in the umbrella policy's "Schedule of Underlying Insurance." *Id.* The umbrella policy's definition of "underlying insurance" was substantially similar to the BITCO Umbrella Policy's definition. *See id.* After the underlying lawsuit for assault and battery settled for $1 million, the primary carrier tendered the remainder of its $500,000 sublimit. *Id.* at 957. The umbrella carrier contributed to the settlement agreement and sued the company that underwrote its reinsurance to recover a portion of the settlement that exceeded the underlying

PLAINTIFF'S BRIEF IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT			Page 16

sublimit. *Id.* In that action, the court held that because the umbrella policy's declarations page listed underlying limits of $1 million, the umbrella carrier had no obligation to provide coverage for liability that did *not* exceed $1 million because, by its terms, the umbrella policy provided that $1 million in general liability limits applied "whether or not that amount was collectible." *Id.* at 962-63. Accordingly, the umbrella carrier was not required to drop down and cover the gap between the $500,000 sublimit provided under the assault-and-battery endorsement and the $1 million general liability limit. *Id.*

As in *Hull*, the BITCO Primary Policy contains an endorsement providing coverage for an otherwise excluded risk (contamination and pollution coverage) with a sublimit ($100,000). Further, the BITCO Umbrella Policy also attaches excess of the limits set forth in the schedule of underlying insurance ($1 million) "whether or not such is collectible." Therefore, the BITCO Umbrella Policy only provides coverage for liability in excess of $1 million. *See Hull*, 985 F. Supp. 2d at 962-63; *see also Garmany v. Mission Ins. Co.*, 785 F.2d 941, 946 (11th Cir. 1986) (where the primary policy provided auto liability coverage of $500,000 for insureds, but contained a sublimit of $20,000 for permissive users, the umbrella policy attached excess of $500,000 rather than the $20,000 sublimit, because the umbrella policy unambiguously set the attachment point for loss "in excess of . . .

the limits of the underlying insurance as set out in the attached schedule," which set the limits of the primary policy as $500,000).

Accordingly, in the alternative, even if the BITCO Umbrella Policy applies, it does not respond until JBBOC has paid the $900,000 difference between the $100,000 sublimit provided under the Primary Policy's Contamination or Pollution Coverage and the $1 million per-occurrence limit of liability.

## V. CONCLUSION

WHEREFORE, for the foregoing reasons, BITCO General respectfully requests that the Court grant its Cross-Motion for Summary Judgment and enter an order finding and declaring that BITCO General has no duty to defend or indemnify JBBOC in connection with the Notice of Violation or any action by the DEQ in connection with the pollution event described therein. In the alternative, BITCO General respectfully requests that the Court grant its Cross-Motion for Summary Judgment and enter an order finding and declaring that BITCO General has no obligation to defend or indemnify JBBOC in connection with the Notice of Violation or any action by the DEQ in connection with the pollution event described therein until JBBOC has paid the $900,000 difference between the

$100,000 sublimit provided under the Primary Policy's Contamination or Pollution Coverage and the $1 million per-occurrence limit of liability.

DATED this 12th day of July, 2019.

      /s/ Gustavo A. Otalvora
John A. Husmann
Gustavo A. Otalvora
BATESCAREY LLP
191 N. Wacker
Suite 2400
Chicago, IL 60606
Telephone: (312) 762-3100
Facsimile: (312) 762-3200
Email: jhusmann@batescarey.com
Email: gotalvora@batescarey.com


      /s/ Jesse Beaudette
Jesse Beaudette, Esq.
Ryan T. Heuwinkel, Esq.
BOHYER, ERICKSON, BEAUDETTE &
TRANEL, P.C.
283 West Front, Suite 201
Post Office Box 7729
Missoula, Montana 59807-7729
Telephone: (406) 532-7800
Facsimile: (406) 549-2253
Email: mail@bebtlaw.com

***Attorneys for Plaintiff***

# CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(D)(2)(E)

This brief complies with the type-volume limitation of Local Rule 7.1(d)(2)(E). This brief contains 3,994 words, excluding the caption, certificate of compliance, and certificate of service.

# CERTIFICATE OF SERVICE

I, the undersigned, a representative of the law firm of Bohyer, Erickson, Beaudette & Tranel, P.C., hereby certify that I served a true and complete copy of the foregoing on the following persons by way of the CM/ECF filing system:

1. Clerk, U.S. District Court

2. James G. Hunt
   HUNT LAW FIRM
   310 E. Broadway St.
   Helena, MT 59601

3. Gregory S. Munro
   Attorney at Law
   3343 Hollis St.
   Missoula, MT 59801

*Attorneys for Defendant J. Burns Brown Operating Co.*

DATED this 12th day of July, 2019.

    /s/ Jesse Beaudette
Jesse Beaudette, Esq.
Ryan T. Heuwinkel, Esq.
BOHYER, ERICKSON, BEAUDETTE & TRANEL, P.C.
283 West Front, Suite 201
Post Office Box 7729
Missoula, Montana 59807-7729
Telephone: (406) 532-7800
Facsimile: (406) 549-2253
Email: mail@bebtlaw.com

*Attorneys for Plaintiff*

2237980