John A. Husmann
Gustavo A. Otalvora
BATESCAREY LLP
191 N. Wacker, Suite 2400
Chicago, IL 60606
Telephone: (312) 762-3100
Facsimile: (312) 762-3200
Email: jhusmann@batescarey.com
Email: gotalvora@batescarey.com
        - and -
Jesse Beaudette
Ryan T. Heuwinkel
BOHYER, ERICKSON, BEAUDETTE & TRANEL, P.C.
283 West Front, Suite 201
Post Office Box 7729
Missoula, Montana 59807-7729
Telephone: (406) 532-7800
Facsimile: (406) 549-2253
Email: mail@bebtlaw.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

GREAT FALLS DIVISION

| | |
|---|---|
| BITCO GENERAL INSURANCE CORPORATION, | Cause No. CV-18-00087-BMM-JTJ |
| Plaintiff, | THE HON. BRIAN MORRIS |
| -vs.- | **BITCO GENERAL INSURANCE CORPORATION'S RESPONSE IN OPPOSITION TO J. BURNS BROWN OPERATING CO.'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| J. BURNS BROWN OPERATING CO., | |
| Defendant. | |

Plaintiff BITCO General Insurance Corporation ("BITCO General"), pursuant to the Court's Order dated April 29, 2019 (Doc. No. 41), respectfully submits this Response in Opposition to Defendant J. Burns Brown Operating Co.'s ("JBBOC") Cross-Motion for Summary Judgment (Doc. No. 45).

# **Table of Contents**

I.      INTRODUCTION ......................................................................................................5

II.     DISPUTED AND UNDISPUTED FACTS .........................................................6

III.    ARGUMENT ............................................................................................................7

     A.     The Umbrella Policy Form Does Not Provide "Follow Form" Coverage, and the Umbrella Policy's Pollution Exclusion Does Not Follow the Form of the Primary Policy ..............................................................7

     B.     The Umbrella Policy's Pollution Exclusion Clearly and Unambiguously Applies to Exclude Coverage for the Underlying Clean-Up Costs ..................................................................................................9

          1.     The Primary Policy Constitutes "Underlying Insurance" ..........................11

          2.     The "Underlying Insurance" at Issue Does Not Provide Coverage for the Clean-Up Costs at the Limits Shown in the Umbrella Policy's Schedule of "Underlying Insurance" ($1 Million) .................................................................................................12

     C.     The *Marjo* Decision Is Irrelevant to this Action, as that Case Involved Distinguishing Facts and Did Not Address the Issues Raised in this Case ...................................................................................................15

     D.     The Doctrine of Ambiguity Has No Application to the Umbrella Policy and Its Pollution Exclusion ......................................................................17

          1.     The Pollution Exclusion's Limitation of the Definition of "Underlying Insurance" Is Facially Unambiguous and, in any Event, Is Irrelevant to this Action .......................................................18

          2.     The Title of the Pollution Exclusion's Endorsement Does Not Create an Ambiguity ..........................................................................19

          3.     The Schedule of Underlying Insurance Does Not List the Primary Policy's Contamination Coverage Endorsement Because the Umbrella Policy Does Not Follow the Contamination Coverage Endorsement ......................................................21

     E.     The Reasonable Expectations Doctrine Does Not Apply Because JBBOC's Alleged Expectations Contradict the Clear and Unambiguous Terms of the Pollution Exclusion ...................................................21

IV. CONCLUSION.................................................................................................................24

## TABLE OF AUTHORITIES

**Cases**

*BITCO General Ins. Corp. v. Marjo Operating Co., Inc.*, No. CIV-14-1220-D,
2016 WL 3920467, at *1 (W.D. Oka., July 15, 2016) .......................................................................... 15, 16

*Fisher v. State Farm Mut. Auto. Ins. Co.*, 305 P.3d 861 (Mont. 2013) ........................................ 7, 17, 21, 24

*Giacomelli v. Scottsdale Ins. Co.*, 221 P.3d 666 (Mont. 20019) ........................................................... 17, 22

*Haering v. Topa Ins. Co.*, 244 Cal. App. 4th 725 (2016) ............................................................................ 20

*In re Healthsouth Corp. Ins. Lit.*, 308 F. Supp. 2d 1253 (N.D. Ala. 2004) ................................................ 20

*James v. Chicago Title Ins. Co.*, 339 P.3d 420 (Mont. 2014) ................................................................ 7, 23

*Kilby Butte Colony, Inc. v. State Farm Mut. Auto. Ins. Co.*, 403 P.3d 664 (Mont. 2017) ...................... 7, 13

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Donaldson Co., Inc.*, 272 F. Supp. 3d 1099
(D. Minn. 2017) .............................................................................................................................................. 8

*Nat'l Union Fire Ins. Co. v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047
(C.D. Cal. 2011) ........................................................................................................................................... 20

*Newbury v. State Farm Fire & Cas. Ins. Co. of Bloomington, Ill.*, 184 P.3d 1021 (Mont. 2008) .......... 7, 22

*Phoenix Ins. Co. v. Ed Boland Construction, Inc.*, 229 F. Supp. 3d 1183 (D. Mont. 2017) ......................... 9

*State Farm Mut. Auto. Ins. Co. v. Braun*, 793 P.2d 253 (1990) .................................................................. 23

*Stonehocker v. Gulf Ins. Co.*, 368 P.3d 1187 (Mont. 2016) ....................................................................... 23

*Transamerica Ins. Co. v. Royle*, 656 P.2d 820 (Mont. 1983) ..................................................................... 23

*Wadzinski v. Auto-Owners Ins. Co.*, 818 N.W.2d 819 (Wisc. 2012) .................................................. 8, 9, 19

**Rules**

Local Rule 56.1(c) .......................................................................................................................................... 6

**Other Authorities**

*Ostrager & Newman*, Handbook on Insurance Coverage Disputes, § 13.01 (17th ed. 2014) ....... 20

# I.      INTRODUCTION

The BITCO umbrella policy's pollution exclusion clearly and unambiguously excludes coverage for the Montana Department of Environmental Quality's demand that JBBOC cleanup and remediate the subject oil spill ("Clean-Up Costs").  However, the pollution exclusion contains one exception: the exclusion does not apply if JBBOC has "underlying insurance" that covers the pollution at issue "*at the limits shown*" in the umbrella policy's Schedule of Underlying Insurance.  The only issue in dispute is whether the exception to the pollution exclusion applies.  As set forth below, the separate BITCO primary policy issued to JBBOC— which is not at issue in this litigation—constitutes "underlying insurance," however that "underlying insurance" does not provide coverage for the Clean-Up Costs "*at the limits shown*" in the Umbrella Policy's Schedule of Underlying Insurance ($1 million).    Therefore, the exception to the pollution exclusion is not satisfied, and JBBOC can never satisfy its burden to prove that the exception applies.

JBBOC, however, ignores this key language in the pollution exclusion, and instead makes a series of arguments that are factually and legally meritless, and that are irrelevant to the Court's analysis of the operative policy language.  JBBOC also mistakenly argues that Montana's reasonable expectations doctrine somehow applies to nullify the unambiguous pollution exclusion.  JBBOC, however, falls well short of meeting its burden of demonstrating coverage under the umbrella policy.  Therefore, as set forth below, the pollution exclusion applies to bar coverage for this matter.

## II.    DISPUTED AND UNDISPUTED FACTS

Pursuant to Local Rule 56.1(c), the parties entered into a Statement of Stipulated Facts (Doc. 38), upon which the parties have relied in support of their respective cross-motions for summary judgment.  Those pertinent facts are summarized in BITCO General's Brief in Support of Cross-Motion for Summary Judgment (Doc. 44), which is incorporated herein.

In addition to the facts set forth in the Statement of Stipulated Facts, JBBOC's Brief alleges several additional facts without any evidentiary support for same.  BITCO General disputes and objects to those unsupported facts, which include but are not limited to the following:

- JBBOC contends that "the Parties bargained for pollution coverage as an integral component of the BITCO Program."  (Doc. 46 at 18, 19.)

- JBBOC contends that "BITCO is an insurer specializing in providing insurance for coal entities, oil operators, heavy industry, etc."  (*Id.* at 6.)

- JBBOC contends that "BITCO markets these products as an insurance 'Program,' tailored to cover the particular risks of the types of businesses BITCO insureds operate."  (*Id.*)

- JBBOC contends that JBBOC purchased the "BITCO Program" to cover "three principle risks an oil and gas producer faces: (1) rupture or leakage of a crude oil pipe or vessel at the well sites, (2) liability arising from operation of company trucks or other vehicles, and (3) liability to non-employees for injury or death on the company's well sites."  (*Id.* at 12-13.)

- JBBOC contends that the "BITCO Umbrella Policy incorporates the [BITCO] Primary Policy as 'underlying insurance.'" (*Id.* at 13)

- JBBOC contends that the "Umbrella Policy does not exclude pollution."  (*Id.* at 22.)

- JBBOC contends that the Umbrella Policy does not list the Primary Policy's Contamination Coverage Endorsement and its sublimit in the Schedule of Underlying Insurance as a result of negligence or an unintentional mistake due to "mixing and matching I.S.O. forms without regard to the ultimate result."  (*Id.* at 26.)

There is no support in the record for any of these statements, and therefore they must be

ignored.  In any event, even if true, none of these allegations have any bearing at all on the legal issues raised in the cross-motions, and can therefore be disregarded.

## III.   ARGUMENT

The interpretation of an insurance contract is a question of law for the Court to decide. *Newbury v. State Farm Fire & Cas. Ins. Co. of Bloomington, Ill.*, 184 P.3d 1021, 1025 (Mont. 2008).  When interpreting an insurance policy, Montana courts ***read insurance policies as a whole*** and reconcile the policy's various parts to give ***each part*** meaning and effect.  *Kilby Butte Colony, Inc. v. State Farm Mut. Auto. Ins. Co.*, 403 P.3d 664, 668 (Mont. 2017).  Montana courts "accord the usual meaning of the terms and the words in an insurance contract, and [they] construe them using common sense." *Fisher v. State Farm Mut. Auto. Ins. Co.*, 305 P.3d 861, 865 (Mont. 2013).  Under Montana law, a court cannot create an ambiguity where none exists. *Newbury*, 184 P.3d at 1025.   In addition, a court may not distort policy language in the face of a reasonable interpretation of the policy provision, and a court may not adopt a construction that would "do violence" to the language of the policy.  *James v. Chicago Title Ins. Co.*, 339 P.3d 420, 424 (Mont. 2014).

## A.   The Umbrella Policy Form Does Not Provide "Follow Form" Coverage, and the Umbrella Policy's Pollution Exclusion Does Not Follow the Form of the Primary Policy

BITCO General issued both the primary policy ("Primary Policy") and the subject umbrella policy ("Umbrella Policy") to JBBOC.  (Statement of Stipulated Facts, at ¶¶ 17 – 22.) It is undisputed that the Primary Policy contains a "Total Pollution Exclusion" that would have otherwise excluded coverage for the underlying Clean-Up Costs.  (*Id*.)  However, for the Primary Policy only, JBBOC purchased pollution coverage, which is provided by way of an endorsement captioned "Contamination or Pollution Coverage" ("Contamination Coverage Endorsement").

(*Id.*)   The Primary Policy's Contamination Coverage Endorsement provides coverage for property damage arising out of the release or escape of oil, with an aggregate limit of insurance of up to $100,000.  (*Id.* at ¶¶ 21-22.)

Throughout its Brief, JBBOC repeatedly suggests that the Umbrella Policy provides follow form coverage.  The Umbrella Policy itself, however, is not a "follow form" policy.[1] Rather, the Umbrella Policy is a stand-alone "umbrella" policy—separate and apart from the Primary Policy—which contains its own insurance terms, conditions, and exclusions.  (*See* Ex. 3 to Stipulated Facts, Doc. 38-3); *see also Wadzinski v. Auto-Owners Ins. Co.*, 818 N.W.2d 819, 829 (Wisc. 2012) (contrasting follow-form policies with stand-alone excess policies and stating that even "following form policies regularly include terms and provisions that afford distinct coverage or exclusions from those provided in the underlying policy.").  Therefore, to determine whether the Umbrella Policy provides coverage for the underlying Clean-Up Costs, the Court must interpret the Umbrella Policy only, and the terms of the Primary Policy and the "BITCO insurance program" are irrelevant to this dispute.

Unlike the Primary Policy, the Umbrella Policy contains a pollution exclusion by way of endorsement captioned "Pollution Exclusion – Follow Form" ("Pollution Exclusion"), which as set forth below applies to bar coverage for this matter.  (Ex. 3 to Stipulated Facts, Doc. 38-3, at pg. 40.)   Contrary to JBBOC's contention, the Pollution Exclusion is not a "follow-form"

---

[1] *See Wadzinski v. Auto-Owners Ins. Co.*, 818 N.W.2d 819, 829 (Wisc. 2012) (stating that "following form" is an "insurance industry term of art that is typically understood . . . to suggest that an excess or umbrella policy incorporates the terms of another underlying policy," and that following form policies "are typically very short, in that they simply state their adoption of underlying policy terms, usually without much else."); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Donaldson Co., Inc.*, 272 F. Supp. 3d 1099, 1103 (D. Minn. 2017) (stating that an excess policy is a follow-form policy "if the excess policy includes language stating that it follows the same terms as the underlying policy, including definitions, conditions, exclusions and, as relevant to the case at hand, endorsements.").

endorsement, rather it is an ***exclusion*** for pollution liability that contains an "underlying insurance" ***exception*** (or "follow-form ***exception***).  *See Wadzinski*, 818 N.W.2d at 829 (holding that an exclusion provided in an endorsement to a "stand-alone" umbrella policy was not a "following form" endorsement, and stating that such a conclusion made "***little sense, as the term ["following form"] is one that is applied to policies as a whole, not to endorsements to a stand-alone policy***.") (emphasis added).

This distinction is particularly important because, under well-established Montana law, if the Court determines that the Pollution Exclusion applies to the underlying Clean-Up Costs (which is undisputed in this case), then JBBOC bears the burden of demonstrating that the "underlying insurance" exception applies.  *See Phoenix Ins. Co. v. Ed Boland Construction, Inc.*, 229 F. Supp. 3d 1183, 1188 (D. Mont. 2017) (discussing the burden of proof in insurance policy interpretation and noting that "[t]he insured has the burden to prove an exception to an exclusion").  In light of the language set forth in the Umbrella Policy, JBBOC's characterization of the Umbrella Policy and its Pollution Exclusion as providing "follow form" coverage is mistaken, and does not aid JBBOC in satisfying its burden of proof that the exception applies.

## B.     The Umbrella Policy's Pollution Exclusion Clearly and Unambiguously Applies to Exclude Coverage for the Underlying Clean-Up Costs

The Pollution Exclusion excludes coverage for pollution liability but contains one exception: the exclusion does not apply if there is "underlying insurance" that covers the pollution at issue "at the limits shown" in the Umbrella Policy's Schedule of Underlying Insurance.  (Ex. 3 to Stipulated Facts, Doc. 38-3, at pg. 40.)  If this "underlying insurance" exception applies, then the Umbrella Policy is subject to (or "follows") the coverage limitations set forth in that "underlying insurance."   Specifically, the Pollution Exclusion provides as follows:

It is agreed that this policy does not apply to:

(1)     "Bodily injury," "property damage" or "personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time; or

(2)     Any loss, cost, or expense arising out of any:

(a)     Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

(b)     "Claim" or "suit" on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants."

***This exclusion does not apply if insurance for such*** "bodily injury," ***"property damage"*** or "personal and advertising injury" ***is provided by "underlying insurance" at the limits shown in the schedule of "underlying insurance."*** Coverage for such "bodily injury," "property damage" or "personal and advertising injury" is subject to the same limitations as the "underlying insurance."

The definition of "underlying insurance" does not include insurance coverage afforded by:

GENERAL LIABILITY – **COVERAGE D. – LIMITED POLLUTION COVERAGE**;

\*       \*       \*

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

\*       \*       \*

*Id.* (italics added).

Therefore, to determine whether the Umbrella Policy's Pollution Exclusion bars coverage here, the Court must first determine whether the Clean-Up Costs at issue fall within the scope of

the Pollution Exclusion and, if so, the Court must then determine whether the "underlying insurance" exception applies.  (*See id*.)

Here, JBBOC has conceded that the answer to the first question is yes.[2]  Therefore, the only question at issue here is whether the "underlying insurance" exception applies.  To prove that the exception applies, JBBOC must demonstrate that: (1) JBBOC has "underlying insurance" that provides coverage for the Clean-Up Costs, and (2) that said "underlying insurance" provides coverage for the Clean-Up Costs at the limits shown in the Umbrella Policy's schedule of "underlying insurance."  (*See id*.)  As set forth below, the first requirement is met by the Primary Policy, but critically, the second requirement is not met, and thus the "underlying insurance" exception does not apply.  Accordingly, the Pollution Exclusion applies to bar coverage for the underlying Clean-Up Costs.

### 1.    The Primary Policy Constitutes "Underlying Insurance"

JBBOC has "underlying insurance" that provides coverage for the underlying Clean-Up Costs—subject to a $100,000 sublimit—and that "underlying insurance" is the Primary Policy as amended by Contamination Coverage Endorsement.  It is undisputed that the Umbrella Policy defines "underlying insurance" as encompassing either (1) coverage afforded under the policies designated on the Schedule of Underlying Insurance located on the umbrella policy's declarations page, or (2) any other insurance that was available to the insured.  (*Id.* at pg. 31.)  Here, the Umbrella Policy lists the Primary Policy on its Schedule of Underlying Insurance, and

---

[2] JBBOC did not address this issue in its Brief, as it admitted in the Statement of Stipulated Facts that the DEQ-mandated Clean-Up Costs constitutes (1) "property damage" "arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time"  and (2) "loss, cost or expense arising out of any . . . [r]equest demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of 'pollutants.'"  (Stipulated Facts, Doc. 38 at ¶¶ 24-25.)

thus the Primary Policy falls within the first prong of the definition of "underlying insurance." (*Id.* at pg. 6.)  Neither party has contended that there was any other insurance policy available. Further, the Primary Policy provides coverage for the underlying Clean-Up Costs (by way of the Primary Policy's Contamination Coverage Endorsement). (Stipulated Facts, Doc. 38, at ¶¶ 21-23.)   Therefore, the Primary Policy constitutes "underlying insurance" that provides coverage for the Clean-Up Costs.

JBBOC contends that the Primary Policy's Contamination Coverage Endorsement itself—as opposed to the Primary Policy—constitutes "underlying insurance." (Doc. 46 at 17-18.)  The terms of the Umbrella Policy do not support such an illogical conclusion, given that the Contamination Coverage Endorsement is not a separate policy but rather is a coverage grant contained in a policy that is already listed in the Schedule of Underlying Insurance.  In any event, this is a distinction without consequence because, as set forth below, the "underlying insurance" does not provide coverage for the Clean-Up Costs at the limits shown in the Umbrella Policy's Schedule of Underlying Insurance.

**2.** **The "Underlying Insurance" at Issue Does Not Provide Coverage for the Clean-Up Costs at the Limits Shown in the Umbrella Policy's Schedule of "Underlying Insurance" ($1 Million)**

In order for the "underlying insurance' exception to apply, the "underlying insurance" must provide coverage for the Clean-Up Costs *at the limits shown in the Umbrella Policy's schedule of "underlying insurance*."  (Ex. 3 to Stipulated Facts, Doc. 38-3, at pg. 40.)  Here, the Umbrella Policy's schedule of "underlying insurance" lists the Primary Policy with limits of *$1 million* per "occurrence" (and $2 million in the general aggregate).  (*Id*. at 6.) However, the Primary Policy (by way of the Contamination Coverage Endorsement) provides a total aggregate limit of *$100,000* for the underlying Clean-Up Costs.  (Stipulated Facts, Doc. 38, at ¶¶ 21-23.)

The Umbrella Policy does not list the Contamination Coverage Endorsement or its $100,000 sublimit in the Schedule of Underlying Insurance, and thus the "underlying insurance" exception can never apply, meaning coverage is barred by the Pollution Exclusion.  (*See* Ex. 3 to Stipulated Facts, Doc. 38-3, at pg. 40.)

JBBOC glosses over this issue and instead makes the conclusory statement—without citing any policy language—that the "underlying insurance" exception applies simply because the Contamination Coverage Endorsement is part of the Primary Policy (which in turn is listed on the Schedule of Underlying Insurance). (Doc. 46 at 18-19.) JBBOC's contention, however, ignores and contradicts the key language of the exception:  that the underlying claim must be covered by "underlying insurance" *at the limits shown* in the schedule of "underlying insurance."  *Id*. (emphasis added).  (Ex. 3 to Stipulated Facts, Doc. 38-3, at pg. 40.)

JBBOC's interpretation that the exception applies so long as there is some underlying coverage reads out of existence clear policy language and fails to read the policy as a whole—in direct contradiction with Montana's clear canons of insurance policy interpretation.  As such JBBOC does not and cannot offer this Court a reasonable interpretation of the Pollution Exclusion.  The exception plainly states that the Pollution Exclusion does not apply if the underlying claim is covered by "'underlying insurance' *at the limits shown* in the schedule of 'underlying insurance.'"  *Id*. (emphasis added).  Because the term "underlying insurance" is immediately qualified by the phrase "*at the limits shown* in the schedule of 'underlying insurance,'" that phrase simply cannot be ignored and must be awarded its clear and logical meaning.  *See Kilby Butte Colony, Inc. v. State Farm Mut. Auto. Ins. Co.*, 403 P.3d 664, 668 (Mont. 2017) (Montana courts read insurance policies as a whole and reconcile the policy's various parts to give each part meaning and effect).  BITCO General's interpretation of this

language is the only one that gives effect to all of the words in the policy, and therefore should be adopted by this Court.

JBBOC admits that the Schedule of Underlying Insurance omits the Contamination Coverage Endorsement and its sublimit, and that if the Contamination Coverage Endorsement and its sublimit were listed, this dispute would not have arisen.  (*See* Doc. 46 at 25-26.)  This is exactly the point—the pollution coverage and its sublimit are not listed, and therefore the exception can never apply.  JBBOC also suggests without evidence that the failure to list the pollution coverage in the Schedule of Underlying Insurance was a mistake (*Id.* at 26), in fact, the contents of the Schedule of Underlying Insurance demonstrate simply that BITCO did not agree to sell, and JBBOC did not contract to buy, pollution coverage in the Umbrella Policy.

Instead of focusing on the actual language of the Umbrella Policy—which is fatal to JBBOC's position—JBBOC makes a series of arguments that are factually and legally unsupported, and that are irrelevant to the Court's analysis of the relevant policy language.

For example, JBBOC alleges that the Pollution Exclusion should not apply here because, according to JBBOC, "the Parties bargained for pollution coverage as an integral component of the BITCO Program," and thus it would be "counterintuitive" to exclude pollution coverage from the Umbrella Policy.  (Doc. 46 at 19.)  First, JBBOC has failed to provide any evidence in support of these allegations.  Second, the actual language contained in the policies is the ***only*** evidence of what the parties bargained for and that language (including the limited pollution coverage) demonstrates that JBBOC did ***not*** bargain for pollution coverage as an "integral" component of the "BITCO Program."  Therefore, there is nothing "counter-intuitive" about the Umbrella Policy excluding coverage for pollution liability.

Ignoring the actual terms of the Umbrella Policy, JBBOC also contends that its interpretation is consistent with the "purpose of umbrella coverage" and the insured's reasonable expectation that the Umbrella Policy would provide "substantially higher limits" than the Primary Policy's Contamination Coverage Endorsement. (*Id.* at 18-19.) JBBOC fails to explain how the "general purpose" of umbrella policies is relevant to the interpretation of the clear and unambiguous terms of the BITCO Umbrella Policy. (*See id.*) Moreover, JBBOC does not explain how the "general purpose" is somehow unmet by the BITCO policies, given that (1) the Primary Policy's limits are actually higher than the Umbrella Policy's limits ($2 million in the aggregate vs. $1 million in the aggregate), and (2) JBBOC bargained for pollution coverage only with respect to the Primary Policy, and the limits for such coverage are much lower than the limits for non-pollution liability ($100,000 in the aggregate vs. $2 million in the aggregate). (*See generally* Doc. 38-2 and Doc. 38-3.)

**C.**     **The *Marjo* Decision Is Irrelevant to this Action, as that Case Involved Distinguishing Facts and Did Not Address the Issues Raised in this Case**

JBBOC's heavy reliance on *Marjo*—which JBBOC returns to in all three sections of its brief—is perplexing considering that *Marjo* is factually inapposite and does not address any of the issues raised in this Action. *See BITCO General Ins. Corp. v. Marjo Operating Co., Inc.*, No. CIV-14-1220-D, 2016 WL 3920467, at *1 (W.D. Oka., July 15, 2016).

In *Marjo*, BITCO General issued a pollution liability policy ("Pollution Policy") and an umbrella policy to the insured. The umbrella policy contained the same pollution exclusion at issue here, and it contained the same definition of "underlying insurance," which the *Marjo* court explained is a two-pronged definition encompassing either (1) coverage afforded under the policies designated on the Schedule of Underlying Insurance located on the umbrella policy's declarations page, or (2) any other insurance that was available to the insured. *Id.* at * 4.

However, unlike in this case, the underlying Pollution Policy in *Marjo* was **not** listed on the umbrella policy's Schedule of Underlying Insurance, and the underlying Pollution Policy's entire $1 million limits applied to the underlying pollution claim.  *Id.*  Therefore, the *sole* issue decided in *Marjo* was whether the underlying Pollution Policy constituted "underlying insurance" under the second prong of the definition of "underlying insurance."  *Id.*  The *Marjo* Court ultimately found that, even though the underlying Pollution Policy was not designated on the umbrella policy's Schedule of Underlying Insurance, it nevertheless constituted "underlying insurance" because it was "other insurance available to the insured" at the time of the incident.  *Id.*  Therefore, the court concluded that the umbrella policy's pollution exclusion did not apply.  *Id.*

The *Marjo* decision simply has no application here, as that case is factually inapposite and did not address the primary issue in this Action.  The issue decided in *Marjo* was whether a separate underlying Pollution Policy that was not listed on the schedule of underlying insurance (as opposed to an endorsement in an otherwise listed policy, as is the case here) constituted "underlying insurance," and even that analysis was limited to the second prong of the definition of "underlying insurance."  That is not an issue here.  As discussed above, the BITCO Primary Policy constitutes "underlying insurance" because that policy **is** listed in the Umbrella Policy's Schedule of Underlying Insurance (and thus falls within the **first** prong of the definition of "underlying insurance").  Rather, the issue here is whether that "underlying insurance" provides coverage for the underlying claim "**at the limits shown" in the Umbrella Policy's Schedule of Underlying Insurance**, given that the "underlying insurance" at issue here contains an endorsement with a sublimit.  The *Marjo* Court simply did not and could not have addressed this issue, given that the Pollution Policy in *Marjo* provided $1 million of coverage for the pollution at issue and there was no sublimit at issue.

Therefore, the *Marjo* decision is irrelevant to this Action, and JBBOC's contention that *Marjo* addressed the "same issue" and the "same policy language" is a gross mischaracterization of that case, which can be ignored.[3]

**D.**     **The Doctrine of Ambiguity Has No Application to the Umbrella Policy and Its Pollution Exclusion**

Under Montana law, an insurance provision that is ambiguous is interpreted against the insurer and in favor of the insured. *Fisher v. State Farm Mut. Auto. Ins. Co.*, 305 P.3d 861, 865-66 (Mont. 2013). An insurance contract is ambiguous if it is "'reasonably subject to two different interpretations.'" *Id.* Whether a provision of an insurance contract is "reasonably susceptible to two different interpretations," is determined from "the viewpoint of a consumer with average intelligence, but untrained in the law or the insurance business." *Id.* However, a provision is not ambiguous "just because a claimant says so or just because the parties disagree as to [its] meaning . . . ." *Id.* Accordingly, Montana courts have stated that courts should not "'seize upon certain and definite covenants expressed in plain English with violent hands, and distort them so as to include a risk clearly excluded by the insurance contract.'" *Id.*

In an attempt to circumvent an interpretation of the clear policy language that is relevant to this dispute, JBBOC makes multiple strained attempts to create ambiguity where none exists. As set forth below, JBBOC falls well short of meeting its burden on ambiguity.

---

[3] JBBOC also relies on the *Marjo* decision for its ambiguity argument, however the *Marjo* Court also did not address the issue of ambiguity. Moreover, the Montana Supreme Court has held that another jurisdiction's interpretation of a policy provision does not demonstrate ambiguity. *See Giacomelli v. Scottsdale Ins. Co.*, 221 P.3d 666, 673 (Mont. 20019) (rejecting the insured's argument that a split of legal authority on the interpretation of an exclusion demonstrates ambiguity, and explaining that such a rule is "inconsistent with the role of the court in determining whether a contract is ambiguous.").

1.      **The Pollution Exclusion's Limitation of the Definition of "Underlying Insurance" Is Facially Unambiguous and, in any Event, Is Irrelevant to this Action**

The Definitions Section of the Umbrella Policy contains a two-prong definition of "underlying insurance." (Ex. 3 to Stipulated Facts, Doc. 38-3, at pg. 31.)  In addition, the Pollution Exclusion itself further limits the definition of "underlying insurance'" by stating that "[t]he definition of 'underlying insurance' does ***not*** include insurance coverage afforded by:

> GENERAL LIABILITY – **COVERAGE D. – LIMITED POLLUTION COVERAGE**;
>
> *             *             *

(*Id.* at 40.)

JBBOC contends that the reference to Coverage D as excluded in the definition of "underlying insurance" creates an ambiguity as to "whether the Primary Policy's [Contamination Coverage] Endorsement is 'underlying insurance.'"  (Doc. 46 at 23.)  In making this argument, JBBOC twice ***misquotes*** the language above.  JBBOC alleges that the definition of "underlying ***coverage***"—as opposed to "underlying ***insurance***"—does not include insurance coverage afforded by Coverage D.  (*Id.* at 22, 23.)  According to JBBOC, this language is somehow confusing because the Primary Policy does not contain Coverage D.  (*Id.*)  As explained below, JBBOC's reliance on this language amounts to nothing more than a strained attempt to find an ambiguity where none exists.

First, there is no dispute as to whether JBBOC has "underlying insurance" that provides coverage for the underlying Clean-Up Costs (subject to the $100,000 sublimit provided by the Primary Policy's Contamination Coverage Endorsement), therefore the Pollution Exclusion's reference to Coverage D (which was not included in the policy) is irrelevant here.

Second, even if there was a dispute as to the existence of "underlying insurance," the limitation of the definition of "underlying insurance" is facially clear and unambiguous.  Under a plain reading of the definition, it simply means that Coverage D (if included) does not constitute "underlying insurance."   The definition of "underlying insurance" cannot be reasonably interpreted any other way.

### 2.     The Title of the Pollution Exclusion's Endorsement Does Not Create an Ambiguity

JBBOC contends that including the phrase "follow form" in the title of the exclusion somehow means that the Umbrella Policy follows the Primary Policy.  (Doc. 46 at 24-25.)  This is an unreasonable interpretation and unsupported by the language of the Pollution Exclusion itself.  The Pollution Exclusion—which includes the phrase "pollution ***exclusion***" in the title— clearly exists to ***exclude*** coverage for pollution (as set forth in detail in the first three paragraphs of the exclusion).  (*See* Ex. 3 to Stipulated Facts, Doc. 38-3, at pg. 40.)  It would be wholly unreasonable to read the Pollution Exclusion and conclude that the Umbrella Policy follows the Primary Policy simply because the title of the Pollution Exclusion contains the phrase "follow form."   This interpretation completely ignores the entire body of the exclusion itself.  Most relevantly, this interpretation ignores the key language of the Exclusion that clearly states that the Exclusion does not apply only if the underlying claim is covered by "underlying insurance" ***at the limits shown in the Umbrella Policy's schedule of "underlying insurance***."   *See Wadzinski v. Auto-Owners Ins. Co.*, 818 N.W.2d 819, 829 (Wisc. 2012) (rejecting the argument that an exclusion provided in an endorsement to a "stand-alone" umbrella policy provided "following form" coverage—even though the endorsement's caption contained the phrase "following form"—and stating that such argument made "***little sense, as the term ["following***

*form"] is one that is applied to policies as a whole, not to endorsements to a stand-alone policy*.") (emphasis added).

Moreover, even if the Pollution Exclusion was a "follow-form" endorsement, JBBOC's interpretation is still unreasonable given that the Exclusion contains its own clear limiting language. Indeed, courts across the country interpreting actual "follow form" policies have consistently held that a following-form clause in an excess policy incorporates the terms of the underlying policy, "except to the extent that the [excess] contract by its own terms specifically defines the scope of coverage differently, i.e., via an exclusion." *See, e.g., Haering v. Topa Ins. Co.*, 244 Cal. App. 4th 725, 734-5 (2016) ("Any inconsistency or conflict between the provisions of a following form excess policy and the provisions of an underlying primary policy is resolved by applying the provisions of the excess policy."), *quoting Ostrager & Newman*, Handbook on Insurance Coverage Disputes, § 13.01 (17th ed. 2014) ("It is well settled that the obligations of following form excess insurers are defined by the language of the underlying policies, except to the extent that there is a conflict between the two policies, in which case, absent excess policy language to the contrary, the wording of the excess policy will control."); *see also In re Healthsouth Corp. Ins. Lit.*, 308 F. Supp. 2d 1253, 1282 (N.D. Ala. 2004) ("[a]s a general rule, 'excess policies are typically following-form instruments that incorporate by reference the terms of the underlying policies *unless* there is a specific term to the contrary in the excess policy.") (emphasis added).[4]

---

[4] The only case that JBBOC cites in support of its "follow form" argument is inapposite, as that case involved the interpretation of a "follow-form" excess policy, not an exclusion that contained an "underlying insurance" exception (or "follow form" exception). Moreover, that case—which applied California law—did not address whether a "follow form" clause created an ambiguity. *See Nat'l Union Fire Ins. Co. v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1053 (C.D. Cal. 2011) (internal citations omitted).

3.     **The Schedule of Underlying Insurance Does Not List the Primary Policy's Contamination Coverage Endorsement Because the Umbrella Policy Does Not Follow the Contamination Coverage Endorsement**

As set forth above, the "underlying insurance" exception does not apply because the Primary Policy does not provide $1 million in coverage for the Clean-Up Costs and the Umbrella Policy does not list the Primary Policy's Contamination Coverage Endorsement or its $100,000 sublimit on the Schedule of Underlying Insurance.  (*Supra* III.B.2.)  The Umbrella Policy's omission of the Primary Policy's Contamination Coverage Endorsement (from the Schedule of Underlying Insurance) does not create an ambiguity, but rather demonstrates a clear intent that the Umbrella Policy does not follow that coverage.

E.     **The Reasonable Expectations Doctrine Does Not Apply Because JBBOC's Alleged Expectations Contradict the Clear and Unambiguous Terms of the Pollution Exclusion**

Similarly, JBBOC fails to demonstrate that the reasonable expectations doctrine applies to invalidate the Pollution Exclusion.  Under Montana law, the reasonable expectations doctrine provides that the objectively reasonable expectations of an insured will be honored.  *Fisher v. State Farm Mut. Auto. Ins. Co.*, 305 P.3d 861, 867 (Mont. 2013).  However, expectations that are contrary to a clear exclusion from coverage are not "objectively reasonable," and thus the doctrine does not apply if the terms of the policy at issue "clearly demonstrate an intent to exclude coverage." *Id*.

As set forth above, the Pollution Exclusion applies to exclude coverage for the underlying Clean-Up Costs, and JBBOC's interpretation to the contrary ignores the clear and unambiguous terms of the relevant terms of the Umbrella Policy (and its Pollution Exclusion).  Therefore, JBBOC's alleged expectation that the Umbrella Policy would follow the Primary Policy's

Contamination Coverage Endorsement is "unreasonable" as a matter of law.  *See Giacomelli v. Scottsdale Ins. Co.*, 221 P.3d 666, 676 (Mont. 20019)

Moreover, the undisputed facts demonstrate that an average insured would not reasonably expect for the Umbrella Policy to provide coverage for pollution liability.  Nothing in Montana law or public policy required JBBOC to obtain excess coverage for pollution liability.  Moreover, the Primary Policy form excludes coverage for pollution liability, but JBBOC purchased pollution coverage for the Primary Policy via an additional endorsement.  The limits provided by that pollution coverage were a fraction of the limits provided by the Primary Policy for non-pollution liability, a fact reflected in the premium paid for the additional pollution coverage.  (*See* Doc. 38-2 and Doc. 38-3.)  JBBOC could have paid for additional pollution coverage under either the Primary Policy, or it could have sought an umbrella policy that provided pollution coverage in the marketplace, but it chose not to despite the fact that the Umbrella Policy contains its own Pollution Exclusion.  Therefore, nothing in the Umbrella Policy or Montana law suggests that JBBOC had a reasonable expectation of coverage for pollution liability under the Umbrella Policy.  *See Newbury*, 184 P.3d at 1027 (stating that parties to an insurance contract may include provisions that exclude coverage without violating public policy if the exclusion applies to optional coverage, rather than mandatory coverage).

JBBOC contends that it had an objectively reasonable expectation of coverage because pollution is a major liability risk for JBBOC.  (Doc. 46 at 27-28.)  This is belied by the fact that JBBOC only chose to obtain limited pollution coverage under the Primary Policy subject to a $100,000 sub-limit.  (*See* Doc. 38-2.)  Moreover, Montana courts have rejected the reasonable expectations doctrine in such circumstances.  *See, e.g.*, *Giacomelli*, 221 P.3d at 674 (where an insured lessee of a horse race track sought coverage arising out of injuries to horse jockeys, the

court held that the insured's expectation that the CGL policy would cover injuries to jockeys was not reasonable, because the exclusion unambiguously expressed an intent to exclude coverage for jockeys injured while participating in horse races).

In contrast, JBBOC cannot point to any case law that supports nullifying the Pollution Exclusion.  Indeed, some of the cases on which JBBOC relies declined to apply the reasonable expectations doctrine, and all of JBBOC's cases are factually inapposite in that they involve completely different exclusions, they involve adhesion contracts, and/or the application of the exclusion required the insured to be familiar with related statutes.  *See, e.g.*, *Stonehocker v. Gulf Ins. Co.*, 368 P.3d 1187, 1191 (Mont. 2016) (rejecting the insured's argument argument that there was a reasonable expectation that an employee was an "insured" under the employer's commercial auto policy, because a reasonable person would not take the fact that the insured corporation engages in business of operating a guest ranch to mean that an entity other than a corporation is insured under the policy); *James v. Chicago Title Ins. Co.,* 339 P.3d 420, 424 (Mont. 2014) (rejecting insured's argument that the reasonable expectations doctrine applied to title insurance that covered loss arising out of an insured not having a "right of access"); *Transamerica Ins. Co. v. Royle*, 656 P.2d 820, 824 (Mont. 1983) (addressing the issue of whether an insurance policy's household exclusion—which excluded coverage for injury to the insured's relative—was invalid because the policy was an adhesion contract and Montana law required motorists to carry insurance against loss resulting from liability imposed by law for injury suffered by any person); *State Farm Mut. Auto. Ins. Co. v. Braun*, 793 P.2d 253, 255-6 (Mont. 1990) (holding that an insurance provision that limited coverage to damages the insured was "legally entitled to collect" was enforceable because a reasonable average insured is not going to be aware that Canadian law restricts damages severely in relation to Montana law).

Finally, JBBOC's claim that the Umbrella Policy is "confusing" simply because it requires the reader to refer to several sections to understand the scope of coverage is absurd.  It is not hyperbole to state that practically every liability insurance policy requires reference to definitions and schedules in order to determine what is covered.  Moreover, BITCO General has demonstrated above that the Umbrella Policy is clearly and unambiguously only subject to one reasonable interpretation. *See Fisher*, 305 P.3d at 866-67 (rejecting the insured's argument that a family-member exclusion was not sufficiently clear and holding that the reasonable expectations doctrine did not apply because "***there is nothing unusual about a policy that requires the insured to read the exclusion section, the definition section, and the declaration page to determine the scope of coverage***.") (emphases added).

Therefore, JBBOC has offered no basis in law or logic sufficient to meet its burden of proving that the reasonable expectations doctrine applies in this case.  Accordingly, the Pollution Exclusion applies to bar coverage for the underlying Clean-Up Costs, and the Court must deny JBBOC's motion for summary judgment.

## IV.    CONCLUSION

WHEREFORE, for the foregoing reasons, BITCO General respectfully requests that the Court deny JBBOC's Cross-Motion for Summary Judgment, and that the Court grant BITCO General's Cross-Motion for Summary Judgment and enter an order finding and declaring that BITCO General has no duty to defend or indemnify JBBOC in connection with the Notice of Violation or any action by the DEQ in connection with the pollution event described therein.

DATED this 2nd day of August, 2019.

　　　　　　　     /s/  Gustavo A. Otalvora
　　　　　　　     John A. Husmann

Gustavo A. Otalvora
BATESCAREY LLP
191 N. Wacker
Suite 2400
Chicago, IL   60606
Telephone: (312) 762-3100
Facsimile:  (312) 762-3200
Email: jhusmann@batescarey.com
Email: gotalvora@batescarey.com


   /s/  Jesse Beaudette
Jesse Beaudette, Esq.
Ryan T. Heuwinkel, Esq.
BOHYER, ERICKSON, BEAUDETTE & TRANEL, P.C.
283 West Front, Suite 201
Post Office Box 7729
Missoula, Montana 59807-7729
Telephone: (406) 532-7800
Facsimile: (406) 549-2253
Email: mail@bebtlaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(D)(2)(E)

This brief complies with the type-volume limitation of Local Rule 7.1(d)(2)(E).  This brief contains 6,224 words, excluding the caption, table of contents, table of authorities, certificate of compliance, and certificate of service.

## CERTIFICATE OF SERVICE

I, the undersigned, a representative of the law firm of BatesCarey LLP, hereby certify that I served a true and complete copy of the foregoing ***Response in Opposition to JBBOC's Cross-Motion for Summary Judgment*** on the following persons by way of the CM/ECF filing system:

1.      Clerk, U.S. District Court

2.      James G. Hunt
         HUNT LAW FIRM
         310 E. Broadway St.
         Helena, MT 59601

3.      Gregory S. Munro
         Attorney at Law
         3343 Hollis St.
         Missoula, MT 59801

         ***Attorneys for Defendant J. Burns Brown Operating Co.***

DATED this 2nd day of August, 2019.

         /s/  Gustavo A. Otalvora
         John A. Husmann
         Gustavo A. Otalvora
         BATESCAREY LLP
         191 N. Wacker
         Suite 2400
         Chicago, IL   60606
         Telephone: (312) 762-3100
         Facsimile:  (312) 762-3200
         Email: jhusmann@batescarey.com
         Email: gotalvora@batescarey.com

         ***Attorneys for Plaintiff***

2251932