James G. Hunt, Esq.
Hunt Law Firm
310 E. Broadway St.
Helena MT 59601
Phone: (406) 442-8552
Facsimile: (406) 495-1660
jhunt@huntlaw.net

Greg Munro, Esq.
3343 Hollis Street
Missoula MT 59801
Phone: (406) 493-5361
greg.munro@umontana.edu
  *Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| BITCO GENERAL INSURANCE CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>J. BURNS BROWN CO.,<br><br>Defendant. | CV-18-87-GF-BMM-JTJ<br><br>**DEENDANT'S RESPONSE BRIEF TO BITCO GENERAL INSURANCE CORPORATION'S BRIEF IN SUPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT** |

Defendant J. Burns Brown Operating Co. ("JBBOC") submits this Response Brief in opposition to Plaintiff's BITCO General Insurance Corporation's ("BITCO") Motion for Summary Judgment and Brief. Doc. 43, 44. JBBOC incorporates by reference the arguments set forth in its Motion for Summary Judgment, supporting affidavit, and Brief. Doc. 45, 45-1, 46.

### I. BITCO'S ATTEMPT TO SHIFT THE BURDEN OF PROVING COVERAGE TO JBBOC SHOULD BE REJECTED.

Here, BITCO attempts to shift the burden to JBBOC to prove coverage. BITCO states Montana law provides that an insured has the burden to prove whether an exception to an exclusion applies. Doc. 44 at 10. See *Travelers Cas. & Sur. Co. v. Ribi Immunochem Research*, 2005 MT 50, ¶¶ 29 & 30, 326 Mont. 174, 183, 108 P.3d 469, 476. Although an accurate statement of the law, it is inapplicable here. Before an insured has the burden of proving that an exception to an exclusion applies, Montana law first requires the insurer to prove the exclusion applies. *Id*.

This is an important distinction. Montana law places the burden on the insured to prove that the subject occurrence is covered under the coverage form. *Id*. The burden shifts to BITCO to demonstrate an exclusion applies. *Id*. "Exclusions from coverage are narrowly and strictly construed 'because they are contrary to the fundamental protective purpose of an insurance policy." *North Pacific Ins. Co. v. Stucky*, 986 F.Supp.2d 1207, 1209 (D.Mont. 2013).

The BITCO Umbrella Policy's insuring agreement, COVERAGE A, covers "property damage" caused by "an occurrence." Doc. 38-3 at 8. It is undisputed that the spill here is an occurrence, and there is no pollution exclusion in the insuring agreement. See Doc. 46 at 9-14. Coverage having been established, the issue is whether the Pollution Exclusion portion of the Follow Form applies. This

issue turns on the provision in the Follow Form that begins: "This exclusion does not apply if…" Doc. 38-3 at 40. JBBOC's argument in its motion for summary judgment is that the Follow Form "exclusion does not apply…" because there is underlying insurance. Doc. 46 at 16-20. Because the issue, as framed by JBBOC, is whether the exclusion applies, the burden is on BITCO to show it applies.

## II. THE PLAIN LANGUAGE OF THE POLICY PROVIDES COVERAGE

BITCO first argues that after the insured reads the policy, she would conclude the plain language of the BITCO Umbrella Policy's "Pollutions Exclusion – Follow Form" excludes coverage (BITCO's "primary argument"). When making this argument, BITCO ignores the second prong of the definition of "underlying insurance" which "includes any other insurance available to the insured…". This prong was the basis of the *Marjo*[1] decision, where a court rejected the exact argument BITCO makes here.

The first prong of the definition of "underlying insurance" is the "coverage afforded under insurance policies designated in the schedule of 'underlying insurance" on the Declarations Page of [the Umbrella Policy]." The definition further states: "The coverage and limits in the Declarations for underlying

---

[1] *BITCO Gen. Ins. Corp. v. Marjo Operating Co., Inc.,* 2016 U.S. Dist. LEXIS 92083 (W. Dist. Okla., July 15, 2016), discussed at Doc. 46 at 14, 17-18. As in its opening Brief, JBBOC cites *Marjo* pursuant to Fed. R. App. P. 32.1.

insurance … apply whether or not such is collectible." Although it is unclear whether this means the insured should look at the Schedule of Underlying Insurance in the Declarations of the Umbrella Policy or the Declarations of the Primary Policy, both have a $1,000,000 policy limit. Although JBBOC has only been paid $100,000, the definition of "underlying insurance" says the $1,000,000 applies even if it is not collectible.

After ignoring the "any other insurance" prong of the definition of "underlying insurance, BITCO attempts to rewrite the policy, arguing there is coverage "only if there is pollution coverage in the underlying primary policy up to the *full limit* of the primary policy." Doc. 44 at 2 (emphasis supplied by BITCO). BITCO further argues the "property damage" at issue must be covered by "underlying insurance" and the "applicable limit of insurance for the pollution coverage must be the *same as the limit of insurance shown in the Umbrella Policy's schedule of "underlying insurance*."[2] Doc. 44 at 13 (emphasis supplied by BITCO).

///

---

[2] Throughout the policy, defined phrases and words are in quotations. Rather than all quotations marks, this is what appears in the Follow Form: schedule of "underlying insurance." On the declarations page, it appears: SCHEDULE OF UNDERLYING INSURANCE. This makes it difficult for an insured to figure out where to find the applicable "underlying insurance" and ultimately find the SCHEDULE OF UNDERLYING INSURANCE SECTION on the BITCO Umbrella Policy's declarations page. This, in and of itself, is ambiguous.

DEFENDANT'S RESPONSE BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT 4

BITCO argued this exact position in its brief in *Marjo*:

> The exception to the **POLLUTION EXCLUSION** expressly *requires* that insurance for "property damage" resulting from pollution be provided "***by 'underlying insurance' at the limits shown in the schedule of 'underlying insurance,***'" for the exception to apply. […] Marjo's contention that the Pollution Policy qualifies as "underlying insurance" under the exception to the Umbrella Policy's **POLLUTION EXCLUSION** is simply inaccurate.

Affidavit of James G. Hunt, Exhibit No. 3 at 8. (emphasis supplied by BITCO).

This argument was rejected in *Marjo*, as it should be here:

> In the Court's view, coverage is available under the plain language of the Umbrella Policy, and is not excluded by that policy's Pollution Exclusion, as the Pollution Policy constitutes "underlying insurance" as that term is defined in the Umbrella Policy.
>
> As noted, "underlying insurance" has a two-pronged definition. It encompasses either (1) coverage afforded under the policies designated on the Schedule of Underlying Insurance located on the Umbrella Policy's declarations page or (2) any other insurance that was available to the insured, with limited exceptions not relevant here. Both policies provided coverage for "property damage" due to incidents such as the leak. Although the Pollution Policy is not designated on the Schedule of Underlying Insurance, it nonetheless constituted "other insurance that was available to [Marjo]" at the time of the insurable incident. Reading both policies fairly, and applying a narrow reading to all exclusionary terms, it is evident the parties intended for BITCO to defend Marjo under the Umbrella Policy against any claim covered by the Pollution Policy once Marjo exhausted coverage.

*Marjo*, 2016 U.S. Dist. LEXIS 92083 at 9-10.

Further, contrary to BITCO's argument, the Follow Form does not use the terms "the ***full limit***" or "***the same as the limit***" and does not require the ***full limit*** of the pollution coverage in the Primary Policy to be $1,000,000. Instead of

directing the insured to the pollution endorsement of the Primary Policy, the Follow Form directs the insured to the Schedule of Underlying Insurance where "the limits shown in the schedule of 'underlying insurance'" are $1,000,000.

As in *Marjo* and as shown in JBBOC's opening brief (Doc. 46 at 18-20), the Schedule of Underlying Insurance specifically identifies the Primary Policy and the Pollution Endorsement is an integral component of it. Because the insured is directed there and nowhere else, the policy language mandates coverage. To argue that the pollution exclusion portion of the Follow Form does not except the Pollution Endorsement from its exclusion stretches a reasonable interpretation of its language.

BITCO conjectures that the average consumer of insurance products would analyze the BITCO Program in a step by step process and conclude there is no coverage. BITCO thinks the insured will conclude the Pollution Endorsement does not count as "underlying insurance" (as BITCO argues) because BITCO chose to omit its limits on the SCHEDULE OF UNDERLYING INSURANCE. This assumes the insured further extrapolates that the Pollution Endorsement does not count as "underlying insurance" because it is not "any other insurance available to the insured…" (as BITCO fails to argue). This extrapolation that BITCO requires of the average consumer of insurance products is not based on the plain language of the policy.

That BITCO found it necessary to wordsmith the plain language of the Follow Form by using and emphasizing different words shows the weakness in its primary argument. BITCO would have let the policy language speak for itself had the Follow Form's plain language required $1,000,000 million pollution coverage in the Primary Policy for coverage to exist. At a minimum, BITCO's use of different words and phrases shows the Follow Form language is subject to at least two reasonable interpretations.

### III.   THE BITCO PROGRAM IS SUBJECT TO TWO REASONABLE INTERPRETATIONS AND IS THEREFORE AMBIGUOUS.

If the Court determines BITCO's interpretation both of the Follow Form and of the BITCO Program as a whole is reasonable, it is not the only reasonable interpretation.

In *Modroo, supra*, the Montana Supreme Court analyzed whether a UIM policy issued to the surviving relatives of a young woman killed in a single-vehicle car crash provided coverage. *Id*., 2008 MT 275, ¶ 23. Coverage hinged on whether the named insured/s were individuals or a partnership. *Id*. The Court found coverage based upon inconsistencies between the insuring agreement and the UIM endorsement and more than one reasonable interpretation of the same. *Id*. Because both Nationwide and Modroo presented reasonable interpretations "from the perspective of a consumer of average intelligence, but untrained in the law or the

insurance business," the policy was ambiguous and coverage was afforded. *Id*. at ¶32.

As in *Modroo,* there is internal conflict in the various parts of BITCO's insurance policy, specifically BITCO fails to list the Pollution Endorsement and its limits on the BITCO Umbrella Policy's Schedule of Underlying Insurance and includes reference on the Follow Form to non-existent Coverage D.  Although JBBOC believes the policy language is clear and directs the insured to the Schedule of Underlying Insurance to determine the amount of coverage, at a minimum, this would confuse the insured as to where she is to go to find the policy coverage.  As in *Modroo*, these conflicts create ambiguity in the BITCO Program under the facts here.  Thus, if both JBBOC's and BITCO's interpretation of the BITCO Program is reasonable, there is ambiguity that must be decided in JBBOC's favor.

## IV. THE POLICY LIMITS OF THE UMBRELLA POLICY ARE NOT THE SAME AS THE POLICY LIMITS OF THE PRIMARY POLICY POLLUTION ENDORSEMENT.

BITCO submits in FN3 that, if there is "coverage" under the BITCO Umbrella Policy, "the ***coverage*** provided by the Umbrella Policy is subject to the to the same ***limitations*** of the 'underlying insurance.'" Doc. 44 at 14. (emphasis added).  Thus, BITCO reasons the aggregate limit would be reduced to $100,000. *Id*.

BITCO provides no authority for its position and ignores the policy language and use of the words "coverage" and "limitations." As used in the policy, it is clear the term "coverage" identifies the type of risks the policy insures, not the dollar amount of coverage. For example, the first section of the insuring agreement of BITCO's Primary Policy is entitled, "SECTION I – COVERAGES." Doc. 38-2 at 23. The three different types of coverage are found in the insurance agreement and on the Quick Reference page of the policy. Doc. 38-2 at 10.

Merriam-Webster's online dictionary defines "limitation" as an act or instance of limiting, the quality or state of being limited, restraint, or a certain period limited by statute. When referring to the dollar amount of risk provided for each coverage in an insurance policy, the words used are "policy limits," not "policy limitations."

If BITCO's cursory suggestion were considered reasonable, there is no question that JBBOC also offers a reasonable interpretation, i.e., that "coverage" defines the risk assumed and not the amount of coverage. As such, an ambiguity exists and JBBOC's interpretation carries.

### V. BITCO'S ALTERNATIVE ARGUMENT THAT THERE IS A $900,000 GAP IN COVERAGE FAILS.

BITCO's alternative argument admits coverage of $1M but argues that its duty to indemnify does not begin until after the loss exceeds $1M. Because

BITCO admits coverage, the distinctions that were important in the primary argument are not important here.[3]

BITCO's argument would have the effect of leaving JBBOC with a $900,000 self-insured retention that JBBOC would have to pay after BITCO paid the Primary Policy's $100,000. Because the declarations page of the Umbrella Policy clearly states that the "Self-insured Retention" is $10,000, this argument should be rejected based on the plain language of the policy and the reasonable expectations of the insured as explained below.

The plain language of Coverage A provides coverage after the $100,000 is paid. It states, "We will pay on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit' because of … property damage…" Doc. 38-3 at 8. "'Retained limit' means the greater of… [t]hat amount of 'underlying insurance' applicable to any 'claim' or 'suit,' whether such 'underlying insurance' is collectable or not; …" Doc 38-3 at 30-31.

"[U]nderlying insurance" is defined under the first prong as "coverage(s) afforded under insurance policies designated in the schedule of 'underlying

---

[3] The fact that BITCO even argues this alternative position demonstrates ambiguity that must be decided in favor of JBBOC. While BITCO has every right to offer alternative arguments, if this Court finds BITCO's arguments reasonable, the only conclusion is that the BITCO Program is subject to at least two reasonable interpretations for determining coverage. See *Moodro, supra.*

insurance' on the Declarations Page of this policy." Doc. 38-3 at 31. Because the Pollution Endorsement is part and parcel of the Primary Policy, it is coverage afforded under the BITCO Primary Policy, which is listed on the SCHEDULE OF UNDERLYING INSURANCE, *supra*. See also, Doc. 46 at 17-18. As explained above and in *Marjo, supra*, if the Pollution Endorsement is not included in the first prong of the definition of "underlying insurance," it must be included in the second prong of the definition, "any other insurance available to the insured."

"Applicable" is not defined in the policy and therefore we must look to the general meaning of the word. Merriam-Webster's online dictionary defines "applicable" as "capable or suitable for being applied." Black's Law Dictionary defines it as "capable of being applied." West Publishing, Centennial Edition (1891-1991).

If the definitions of "underlying insurance" and "applicable" are inserted, "retained limit" means:

> [t]hat amount of coverage afforded under insurance policies designated in the schedule of underlying insurance on the Declarations Page of this policy (or any other insurance available) capable or suitable for being applied to any claim or suit, whether such 'underlying insurance' is collectable or not.

Here, the only coverage afforded capable of being applied to this case is the Pollution Endorsement. The pollution endorsement's aggregate limit of $100,000 was exhausted. Thus, the "retained limit" is $100,000.

Thus, BITCO's duty to pay starts at $100,000 (plus the $10,000 self-retention). Nowhere does the policy provide any "retained limit" or "self-insured retention of $900,000. Accordingly, applying COVERAGE A, BITCO has promised to pay all ultimate net loss in excess of $100,000, not $1M as it argues

In addition to the above, the OTHER INSURANCE section found in SECTION V – CONDITIONS, provides that if there is "other insurance," the BITCO Umbrella Policy will pay its share of the "ultimate net loss" that exceeds the "total amount that all such other insurance would pay for the loss in the absence of this insurance" and the "total of all deductible and self-insured amounts under this or any other insurance." Doc. 38-3 at 24. This section makes no reference to the "retained limit." The plain language of this section means that BITCO is obligated to pay any amount of "ultimate net loss" exceeding the sum that all other insurance "would" pay. The only other insurance that "would" pay, and has paid, is the Pollution Endorsement. Accordingly, BITCO's duty to indemnify begins after the $100,000 Pollution Endorsement limit was exhausted.
///

## VI. BITCO'S ALTERNATIVE ARGUMENT DEFIES THE "REASONABLE EXPECTATIONS" OF AN INSURED.

If there were ever a good argument for application of the "reasonable expectations" doctrine, it is BITCO's reading of the policy that leaves a $900,000 gap in coverage. No insured's reasonable expectations would expect such a result.

DEFENDANT'S RESPONSE BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                              12

No insured would knowingly purchase such coverage. The insured reasonably expects an umbrella policy to provide much higher limits than the underlying coverage, and nothing in the umbrella policy can be construed to be an agreement for a $900,000 self-insured retention.

BITCO argues that if coverage exists, the insured would read and understand the policy to say that after BITCO paid the $100,000 from the Primary Policy, her company would be responsible for $900,000 out of its pocket and when the remediation costs exceed $1M, BITCO's obligation to indemnify her company under the Umbrella Policy would start. Despite the policy's express provision in the Declarations Page "Self-insured Retention" of $10,000, Doc. 38-3 at 6, BITCO is telling this Court (and its insured) that it sold an insurance Program (uniquely designed to "safeguard" and "protect" its insured) to an oil and gas producer that covers the first $100,000 in pollution, leaves a $900k "gap" in coverage, and then starts paying again after the cleanup costs exceed $1,000,000 (thereby leaving its insured to cover the $900,000 "gap"). This is an untenable proposition that violates Montana public policy related to insurance and all reasonable expectations of the insured. On this basis alone, the argument should be rejected.

Montana law supports the proposition that an exclusion counter to the reasonable expectations of the insured can, by itself, nullify the exclusion:

> The reasonable expectations doctrine provides that the objectively reasonable expectations of insurance purchasers regarding the terms of their

>policies should be honored notwithstanding the fact that a painstaking study of the policy would have negated those expectations. The genesis of this doctrine is "the judicial recognition that most insurance contracts, rather than being the result of anything resembling equal bargaining between the parties, are truly contracts of adhesion in which many insureds face two options: (1) accept the standard insurance policy offered by the insurer, or (2) go without insurance." The reasonable expectations doctrine, however, "is inapplicable where the terms of the policy at issue clearly demonstrate an intent to exclude coverage." This is because expectations "contrary to a clear exclusion are not 'objectively reasonable.'"

*Giacomelli v. Stocksdale Ins. Co.*, 2009 MT 418, ¶ 42, 354 Mont. 15, 26-27, 221 P.3d 666, 674. "The determination of whether the expectations of the purchaser of an insurance policy are objectively reasonable must begin with an assessment of the nature of the security which a reasonably prudent layman would understand the policy generally designed to provide." *Shook v. State Farm Mut. Ins. Co.*, 872 F.Supp. 768 (Mont. 1994), citing *State Farm Mutual Automobile Ins. Cos. v. Queen*, 212 Mont. 62, 685 P.2d 935 (Mont. 1984).

JBBOC's expectation— that the Umbrella policy coverage starts immediately upon exhaustion of the underlying policy—is eminently reasonable. BITCO's alternative argument is not. It is unreasonable to think an insured would purchase a policy and reasonably expect such a "gap" in coverage. Further, if the Court were to view BITCO's proposed interpretation as legitimate, it would require a "painstaking study" of the policies resulting in an outcome adverse to such reasonable expectations. See *Kilby v. Butte Colony, Inc. and State Farm*, 2017

MT 246, ¶ 10, 389 Mont. 48, 53, 403 P.3d 664, 668. BITCO's alternative argument should be summarily rejected.

### VIII. UNION INSURANCE CO. V. HULL IS INAPPLICABLE.

For its alternative argument BITCO relies exclusively on *Union Insurance Co. v. Hull & Co., Inc.*, 985 F.Supp.2d 951 (S.D. Iowa 2012). Doc. 44 at 16-18. In *Hull,* the "umbrella insurer" contracted with the "insurance agency" to underwrite and bind policies. The insurance agency bound umbrella coverage for a bar (the "insured") excess of an ***existing*** CGL policy the insured had with a different primary insurer. An employee of the insured assaulted and seriously injured a patron, who sued the insured. That claim was settled, and both the primary insurer and umbrella insurer paid the loss.

Thus, *Hull* is really a case examining the underwriting relationship between an umbrella insurer and an insurance agent. The court noted, "[[T]he umbrella insurer] and [the insurance agent] are both sophisticated participants in the insurance industry and savvy to the potential existence of endorsements that could modify coverage…" *Id*. at 961. Thus, the *Hull* court did not consider or cite a single case interpreting insurance contracts between an insurer and insured. Here, BITCO, a specialty insurer, has a significant advantage in legal and insurance sophistication over JBBOC, a small Havre-based oil company. Doc. 45-1 at ¶¶ 1-4.

Significantly, in *Hull* the umbrella policy was bound on a ***preexisting*** primary policy. Here, BITCO offered its policies jointly as the BITCO Program marketed as one insurance product meant to "anticipate the hazards [JBBOC] face[s … to] create a unique policy to safeguard [JBBOC]." These promises are made by BITCO to its insureds by way of its marketing program in its website. See Doc. 46 at FN 1, *see, also*, Affidavit of James G. Hunt, Exhibit Nos. 1 & 2. Accordingly, Responsibility for the Program's internal inconsistencies rests solely on BITCO. Doc. 46 at 22-23.

Finally, as here, the problem in *Hull* was created when insurance companies failed to ensure compatibility between a preexisting primary CGL policy and an umbrella policy that was bound later. Here, the BITCO Program was cobbled together with various policy and endorsement forms that are internally inconsistent, e.g., reference to Coverage D when it does not exist. Doc. 46 at 21-23. This cobbling together of forms is fertile ground for ambiguity and confusion.

## IX. THERE ARE SIGNIFICANT AND MATERIAL DIFFERENCES BETWEEN THE POLICIES HERE AND IN *HULL*.

In *Hull*, the umbrella policy defined "underlying insurance" solely as "the insurance policies listed as Underlying Insurance, in the Declarations which provide the coverage and limits stated." *Hull* at 962. As discussed above[4] and in

---

[4] In its analysis of *Hull*, BITCO again fails to acknowledge the second-prong of the definition of "underlying insurance" found in BITCO Umbrella Policy.

JBBOC's original brief, the BITCO Umbrella Policy defines "underlying insurance" as the "coverages afforded" under the policies listed on the Schedule of Underlying Insurance and as "any other insurance available to the insured." Doc. 38-3 at 31.

The *Hull* court relied on the singular definition of "underlying insurance" and its reference to the policy limit listed in the declarations page to determine the umbrella insurer had no contract damages. In this case, the definition of "underlying insurance" is not limited to the policies listed on the Schedule of Underlying Insurance, but includes the coverages afforded under those policies. Therefore, BITCO cannot argue that the BITCO Umbrella Policy's coverage is triggered only after $1M because "underlying insurance" means the coverage afforded under the BITCO Primary Policy, which was $100,000 from the Pollution Endorsement.

Further, the insuring agreement in *Hull* states, relevantly, that the umbrella insurer agreed to pay "the **ultimate net loss** the insured becomes legally obligated to pay…" *Hull* at 956. The BITCO Umbrella Policy insuring agreement is different because it includes the phrase, "in excess of the 'retained limit.'" As discussed above, the retained limit can only be reasonably construed as $100,000.

///

## CONCLUSION

For the foregoing reasons, JBBOC requests this Court deny BITCO's motion for summary judgment, grant summary judgment in its favor and find that the BITCO Umbrella Policy covers the Spill.

DATED this 2nd day of August, 2019.

/s/ James G. Hunt
JAMES G. HUNT


/s/ Gregory S. Munro
GREGORY S. MUNRO
*Attorneys for Defendant JBBOC*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document is drafted in Times New Roman font, size 14, and that it contains 3,867 words, excluding Caption, Certificate of Compliance, and Certificate of Service.

/s/ James G. Hunt
James G. Hunt

## **CERTIFICATE OF SERVICE**

I hereby certify that, on August 2, 2019, I served a true and complete copy of the foregoing on the following persons by way of the CM/ECF filing system:

> Jesse Beaudette, Esq.
> Ryan T. Heuwinkel, Esq.
> BOHYER, ERICKSON, BEAUDETTE & TRANEL, P.C.
> 283 West Front, Suite 201
> Post Office Box 7729
> Missoula, Montana 59807-7729
>
> John A. Husmann
> Gustavo A. Otalvora
> BATESCAREY LLP
> 191 N. Wacker, Suite 2400
> Chicago, IL 60606
>
>  /s/ James G. Hunt